RECEIVED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAY 2 2 2009

AT 8:30_____M
WILLIAM T. WALSH
CLERK

------------------------------------------------------X
KYLE DAY,                                    :     Civil Action No. 06-409
                                             :     (Pisano, J.) (Bongiovanni, M.J.)
                            Plaintiff,        :
                                             :
              - against -                     :     **Final Pretrial Order**
                                             :
R. JAMES NICHOLSON, Secretary,               :
Department of Veterans Affairs,              :
                                             :
                            Defendant.        :
------------------------------------------------------X

This matter having come before the Court for a pretrial conference pursuant to Fed.R.Civ.P. 16; and Alan E. Wolin, Esq., having appeared for the plaintiff, and AUSA J. Andrew Ruymann, having appeared for the defendant; the following Final Pretrial Order is hereby entered:

1.    *Jurisdiction (set forth specifically)*

Plaintiff, a former Information Technology Specialist, GS-9, Target 11, employed by the Department of Veterans Affairs, brings this action, pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §791 *et seq.* and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 *et seq.*, claiming employment discrimination based upon disability and reprisal.

2.    *Pending/Contemplated Motions (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize the matter and each party's position.)*

File by 6/12/09 ; returnable 7/6/09

Plaintiff has no pending or contemplated motions.

Defendant contemplates bringing the following motions in limine.

1) A motion in limine to bar plaintiff from recovering damages due to plaintiff's refusal to submit to a complete pulmonary functions study by defendant's medical expert.

2) A motion in limine to limit the damages plaintiff could recover in this matter because the use of a bogus college degree on his employment application and issues concerning the verification of his experience brought about the suspension of his access to the network and made him unqualified for and unemployable in his probationary position. Accordingly, plaintiff could not remain in his probationary position, even if he were not terminated due to his inability to perform

the essential functions of his position, he has no reasonable expectation of continued employment in that position, let alone advancement, and he should be prohibited from recovering lost wages, back pay or front pay.

3) A motion in limine barring plaintiff from pursuing any claim on which he failed to exhaust his administrative remedies.

4) Defendant requests the following schedule for motions in limine: file by June 12, 2009; returnable July 6, 2009.

**3.** ***Stipulation of Facts** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties.*

1.      Plaintiff, Kyle Day, began his employment with the Department of Veterans Affairs ("DVA" or "agency"), on June 13, 2004, after he was hired to fill the position of Information Technology Specialist (ITS, GS-2210-09, Target 11, and assigned to the Department of Veterans Affairs New Jersey Health Care System ("VANJHCS"), at the Lyons Campus, located in Lyons, New Jersey. Plaintiff, a former Marine, was hired under the Veterans Readjustment Act.

2.      Plaintiff was terminated from his position by the DVA prior to the end of plaintiff's one-year probationary period. Plaintiff's termination was effective May 24, 2005. The agency's termination, dated May 13, 2005, signed by Terry C. Stewart, Chief, Human and Learning Resources Service, VANJHCS, amended a termination letter, dated May 10, 2005, made plaintiff's removal effective May 24, 2005, discussed the major responsibilities of plaintiff's ITS position and the physical demands of that position, discussed plaintiff's medical limitations caused by his diagnosed condition of "Severe COPD" (Chronic Obstructive Pulmonary Disease) and plaintiff's request for accommodation of that condition, advised plaintiff that the agency had determined that his medical limitations prevented him from performing the essential functions of his ITS position and advised plaintiff that "because you are unable to perform the essential functions of your current IT position with or without an accommodation and because we were unable to locate a suitable reassignment position for you, we are left with no choice but to separate you from the Agency during your probationary period, effective May 24, 2005."

3.      When plaintiff began his employment on June 13, 2004, as an ITS at the Lyons Campus, his first-line supervisor was Juanita Walley, Computer Supervisor, his second-line supervisor was Steve Stoner, Assistant Chief, Information Resource Management (IRM), and his third-line supervisor was Beverly Erhardt, Chief, IRM.

4.      Some of the responsibilities for plaintiff's ITS position included the maintenance and repair of IT equipment; installation of various peripheral computer devices, such as PC's, CRT's, printers, scanners, bar code equipment, and modems and performing preventative maintenance. The position was located at the Lyons Campus, a DVA health care facility where a wide range of health

care, including inpatient, outpatient and nursing home care, was provided to veterans. The Lyons Campus was divided into three major parts and made up of 40 separate buildings, one to three stories, spread out over approximately 300 acres of land.

5.      The group (referenced herein as the "Tech Section" or "section") in which plaintiff worked included four technicians, including himself, who were supervised by a GS-12 Computer Supervisor. Three of the technicians, including plaintiff, were at the GS-9 level. One of the technicians was a GS-7. At the time of his employment, plaintiff was the only GS-9 in the section subject to a one-year probationary period. Two contractors were also assigned to the section.

6.      Ms. Walley served as plaintiff's first-line supervisor from June 13, 2004, until Nafis Sharif became plaintiff's first-line supervisor in August or September 2004.

7.      In the first half of October 2004, after Mr. Sharif advised plaintiff to get medical documentation stating his limitations, plaintiff obtained a note, dated October 8, 2004, from Ruth F. Ramirez, a Nurse Practitioner with the VANJHCS, and presented the note to Mr. Sharif. Nurse Practitioner Ramirez's note stated that plaintiff was her patient; he is diagnosed with "severe COPD"; he is on continuous oxygen therapy, and that due to his condition he is not able to engage in a number of activities.  The note also stated that plaintiff could not climb stairs, have direct contact with patients or patient areas with airborne problems, walk long distances, and be exposed to extreme temperature changes. Further the note stated that plaintiff should avoid stressful environments as much as possible and be provided rest periods as needed.

8.      Plaintiff did not make a request for accommodation of his condition until after Mr. Sharif became his supervisor. In mid-October 2004, Mr. Sharif advised plaintiff that he needed to submit a request for reasonable accommodation and provided plaintiff with the VANJHCS Reasonable Accommodation Policy, which included a reasonable accommodation request form.

9.      Plaintiff submitted his reasonable accommodation request to management. By his request, which included a supporting assessment by Nurse Practitioner Ramirez, plaintiff sought accommodation in the form of limiting his work assignments to Circle One and providing him with a "scooter" or motorized cart to assist his movements when working in Circle One. The assessment prepared by Nurse Practitioner Ramirez stated that plaintiff's impairment limited him from walking far and exerting himself, and that he needed to work in Circle One in order to avoid extreme changes in temperature and air borne infection that may be present in other buildings/areas on the Lyons Campus.

10.     Ms. Erhardt received plaintiff's accommodation request in mid-October 2004. Upon receiving the request, Ms. Erhardt contacted the VANJHCS Human and Learning Resources Service. That office then reviewed the request and forwarded it to the agency Employee Health Physician for review. Ms. Erhardt instructed plaintiff to take leave while his request for accommodation was being considered.

11.     Jenny Liu, M.D., M.S., the Employee Health Physician, stated, in a Memorandum, dated November 5, 2004, that "[plaintiff's] accommodation request would require him to be removed from his essential function as an IT specialist. Due to the limited medical information and clinical assessment, a full evaluation cannot be made at this time."

12.     On his own accord, on November 4, 2004, before plaintiff received any written notification from the agency responding to his accommodation request, plaintiff returned to work. In a memorandum, dated November 5, 2004, Ms. Erhardt provided plaintiff with the agency's official response to plaintiff's request for reasonable accommodation and conveyed her understanding to plaintiff about his fitness for duty.  That memorandum, among other things, 1) stated the physical demands identified in plaintiff's position description, 2) referenced some of the information provided in Nurse Practitioner Ramirez's note of October 8, 2004, and  assessment supporting plaintiff's accommodation request, 3) conveyed the determination of the Employee Health Physician that plaintiff could not perform the essential physical demands of his position given his diagnosis and the restrictions prescribed by Nurse Practitioner Ramirez, 4) informed plaintiff that, based on the medical documentation he provided (that is, the documentation from Nurse Practitioner Ramirez), Ms. Erhardt was advised that plaintiff's condition prevents him from performing the essential physical demands of his position and that he did not meet the definition of a qualified disabled person under the Rehabilitation Act, 5) advised plaintiff that Ms. Erhardt believed that his condition prohibits him from fulfilling the physical demands of his position and that his presence on duty places him at great risk of further harm, 6) acknowledged that plaintiff chose to return to work, despite the fact that his health precludes him from fulfilling the essential functions of his position, 7) advised plaintiff that he would be held fully responsible for placing himself in jeopardy by returning to work, 8) advised plaintiff that the agency could not protect him from exposure to airborne infections and temperature changes and that restricting his assignments would not prevent him from encountering such environmental conditions, 9) informed plaintiff that modifying his job by taking away duties or functions that are essential components of the job is not considered reasonable accommodation, 10) informed plaintiff that, in view of the restrictions advanced by Nurse Practitioner Ramirez, the agency would only be able to assign plaintiff very little work and that doing so would place an undue burden on others and impact the agency's ability to fulfill its mission, 11) advised plaintiff that if he chose to report for duty, that Ms. Erhardt would understand that plaintiff had decided to place himself at risk and will perform all elements of his job including the physical demands, 12) advised plaintiff that, as an alternative, the agency's Human Resources office would notify him if other positions come available within the healthcare system which have physical demands more consistent with plaintiff's condition, 13) advised plaintiff that Ms. Erhardt and plaintiff's supervisors would support his desire to work without modification of duties and assignments, and 14) informed plaintiff that he may be directed to perform work in any area of the campus.

13.     In a memorandum, dated April 29, 2005, the Director of the VANJHCS, Kenneth Mizrach, informed plaintiff that he could be placed in two vacant available positions, that the positions required a qualified typist, that plaintiff would be required to submit a certification declaring his typing qualifications for the position, that placement in the positions is immediate, and

that the physical requirements of the positions were consistent with the limitations articulated by plaintiff's health care provider.

14.     At some point in early 2005, the Tech Section moved its offices from Building 8, which was a handicap accessible building, to Building 11, which was not a handicap accessible building. Close in time to the move to Building 11, plaintiff obtained a scooter or motorized cart, which he used, at times, to transport himself around the Lyons Campus during working hours.

15.     Before the Tech Section moved to Building 11, plaintiff stored the scooter in a storeroom near Building 8. After the move to Building 11, plaintiff stored the scooter near his desk in Building 11. In that Building 11, during that time, was not equipped with a handicap ramp, the scooter could not be driven into the building. As a result, on those days when plaintiff used the scooter, plaintiff's coworkers assisted him by carrying the scooter out of and into Building 11.

16.     During the week of March 14, 2005, plaintiff made a request to Mr. Stoner, the Assistant Chief of IRM, for the installation of a ramp outside Building 11 to facilitate the access to the building with his recently procured scooter. Mr. Stoner responded to plaintiff's verbal request for the installation of a ramp in a memorandum, dated March 24, 2005. In that memorandum, Mr. Stoner 1) referenced Ms. Erhardt's letter to plaintiff, of November 5, 2004, 2) reiterated some of the statements addressed in that letter, (including Ms. Erhardt's statement that the agency's Employee Health Physician had determined that plaintiff's condition precluded him from being able to perform the essential functions of his position and the determination that plaintiff did not meet the technical requirements for accommodation under the Rehabilitation Act), 3) advised plaintiff that the IRM did not have the authority to construct the ramp plaintiff requested, 4) advised plaintiff that under the VANJHCS's Reasonable Accommodation Policy plaintiff's request, that is, a request for the removal of an architectural barrier, needed to be submitted directly to the VANJHCS's Reasonable Accommodation Committee for review, 5) instructed plaintiff to put his request in writing on forms provided and to submit those forms to the VANJHCS EEO Manager, and 6) advised plaintiff that the EEO Manager would ensure that plaintiff's request was reviewed by the Reasonable Accommodation Committee. Mr. Stoner's memorandum addressed another matter as well, besides plaintiff's request for a ramp, as Mr. Stoner's memorandum also requested that plaintiff advise whether his service connection (disability) rating had been raised to 100% and whether that status now precluded him from working.

17.     In response to Mr. Stoner's memorandum of March 24, 2005, plaintiff's attorney sent a letter, dated April 5, 2005, to Toni Hindsman, the EEO Manager for VANJHCS, in which he lodged a complaint of discrimination, requested the EEO process be implemented immediately, advised that the agency had failed to provide him with a reasonable accommodation or engage in an interactive process, asserted that the agency had engaged in retaliatory actions, creating a hostile work environment, since plaintiff's first request for reasonable accommodation and referred the matter of plaintiff's request for a ramp outside Building 11 to Ms. Hindsman.

18.     In a letter, dated April 12, 2005, Ms. Hindsman responded to the letter of April 5,

2005, from plaintiff's attorney. In her letter, Ms. Hindsman provided information about the initiation of the EEO process; advised that, in order to address plaintiff's request for reasonable accommodation, a review must be conducted of medical documentation from plaintiff's treating physician; stated that, to date, such documentation had not been provided to the EEO Manager's office; and advised that once she received the requested medical documentation, a decision would be made. In a letter, dated April 15, 2005, Mr. Stoner responded to the letter of April 5, 2005, from plaintiff's attorney.

19.     In a memorandum dated April 20, 2005, Mr. Stoner advised plaintiff that his access to the agency's network had been reduced.

20.     On or about April 20, 2005, coinciding with and as a result of the suspension of plaintiff's access to the computer network, plaintiff was assigned to work directly under Mr. Stoner. Subsequently, Mr. Stoner assigned plaintiff projects. Initially, once plaintiff's access was suspended, Mr. Stoner contemplated assigning plaintiff to the medical media section in IRM, however, he chose to have plaintiff work directly under him instead.

21.     On or about May 4, 2005, Mr. Stoner had plaintiff return keys to the storeroom where plaintiff had kept his scooter and battery charger prior to the Tech Section's move to Building 11.

22.     Plaintiff worked under his first line supervisor, Mr. Sharif, from the time plaintiff returned to work in early November 2005, after the agency denied his request for reasonable accommodation to work in Circle One only, until he was reassigned, on or about April 20, 2005, to work on projects directly under Mr. Stoner.

**4.     *Plaintiff's Contested Facts** (State separately for each plaintiff.  Proofs shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof.)*

A. *Plaintiff intends to prove the following contested facts with regard to liability:*

1.     Plaintiff's diagnosed medical condition is Severe Chronic Obstructive Pulmonary Disease, with symptoms, described by plaintiff, as similar to extreme asthma.

2.     At the time of his employment, plaintiff was the only GS-9 subject to a one-year probationary period and the only technician in a position that had growth potential to the GS-11 level. Two contractors were also assigned to the section. Plaintiff asserts that when he began working in the Tech Section he was not using oxygen to assist his breathing, however, within one month of starting his employment, he contends he continuously used oxygen at work.

3.     Plaintiff asserts that he advised Ms. Wally of his condition at the time he commenced employment and that, as an accommodation to his limitations caused by his COPD, she adjusted his

work assignments or work orders so that plaintiff would be working in a portion of the Lyons Campus known as Circle One, which was near the building, Building 8, where plaintiff's section was located. In that the various buildings in Circle One were connected by tunnels, plaintiff would not have to go outside when he worked in Circle One.

4.   Plaintiff took the reasonable accommodation form to the agency's EEO office and Jeff Harley, the EEO Manager, assisted him in the preparation of the form.  Defendant denied plaintiff's request(s) for reasonable accommodation.

5.   The VANJHCS's Reasonable Accommodation Policy, among other things, provided that

> [r]eassignment is a form of reasonable accommodation that will be provided by VANJHCS, absent undo hardship, to an employee who, because of a qualifying disability, can no longer perform the essential functions of their current position, with or without reasonable accommodation. Reassignment is a "last resort" accommodation that must be considered if there are no effective accommodations that would enable employee to perform the essential functions of their current position, with or without reasonable accommodation.

6.   Plaintiff rejected the agency's offer of accommodation by reassignment to the vacant positions.  Plaintiff testified that he believed he was not qualified for the positions offered notwithstanding his assertion that he was a "good typist." Plaintiff characterized the agency's offer of reassignment to those vacant positions as an insult and harassment.

7.   Close in time to the move to Building 11, plaintiff obtained a scooter or motorized cart, which had been prescribed by his DVA healthcare provider.

8.   During that time, Mr. Sharif assigned plaintiff to work orders throughout the Lyons Campus.

9.   Nicholas Valente, another IT Specialist, GS-9, in the technology section and another co-worker, Vincent Mileto, exchanged assignments/work orders with plaintiff so that plaintiff would not have to go to patient areas. Under this arrangement, plaintiff would take Mr. Valente's and Mr. Mileto's office area assignments and they would take those assignments given to plaintiff which would have required him to go to patient areas.

10.   Mr. Sharif was promoted to be supervisor of plaintiff's section from a non-supervisory position. Mr. Sharif had two "blow ups" with plaintiff during the time he supervised plaintiff, one of which occurred on October 15, 2004, after plaintiff refused to go to a building for an assignment. Mr. Stoner was aware of these incidents in which Mr. Sharif raised his voice to plaintiff. Mr. Stoner looked into the incidents. In response to these incidents, Mr. Stoner counseled

Mr. Sharif, assigned him a mentor and had him take supervisory training.

11.     Plaintiff can lift items weighing 50-75 pounds.

12.     Walking to all areas of the campus and lifting up to 50 pounds are not included in the section labeled "Major Duties" of a Information Technology Specialist on the position description.

13.     Plaintiff believed that an assignment to Circle I would limit his outside exposure because everything is connected by tunnels and everything in Circle I is handicap accessible.

14.      Defendant's Reasonable Accommodation Policy, among other things, states that

> VANJHCS may, in circumstances where an individual has requested an accommodation and has provided insufficient documentation, have its own physician, at no cost to the individual, examine the person to determine the existence of a disability and the need for an accommodation. This will only be done if the person requesting an accommodation provided insufficient documentation from their health care professional and the approving official(s) has communicated this information to the individual and individual has neither provided additional information or once again, provided insufficient information.

15..     Defendant never sent plaintiff to any fitness for duty examination.

16..     Defendant admitted it did not offer a fitness for duty exam.

17.     Nick Valente, a co-worker, testified that he heard Mr. Sharif say to plaintiff words to the effect "You know you are disabled, you can't do a lot of work, so maybe you don't deserve an 11."

18.     Vincent Mileto, a-co-worker, testified that he once heard Mr. Sharif tell plaintiff "If you can't do the job because of a disability you shouldn't be promoted."

19..     Mr. Valente testified that he believed that plaintiff was doing a good job, that plaintiff's knowledge base was better than his and that plaintiff had more schooling.

20..     Plaintiff's counsel's letter to defendant requesting to initiate the EEO process was dated April 5, 2005.  It was faxed to the agency at Lyons, New Jersey on that date.

21.     Toni A. Hindsman, EEO Manager, responded to plaintiff's counsel's letter on April 12, 2005.

22.    Plaintiff was the only employee in Information Resource Management who was terminated between May, 2003 and May, 2005.

23..   Mr. Stoner and Ms. Erhardt interviewed plaintiff before he was hired.  They asked plaintiff questions about his education and previous employment history.  They also asked him technical questions.  They were satisfied with his responses and thought he had an impressive resume.

24.    The Vacancy Announcement for plaintiff's position with defendant dated April 8, 2004 indicates that an undergraduate or graduate degree was not required.

25.    Plaintiff, subsequent to his dismissal with defendant became employed with the Internal Revenue Service as an Information Technology Specialist.  His overall rating with the Internal Revenue Service was "Fully Successful."  Subsequent to his employment with the Internal Revenue Service, plaintiff became employed by the Department of the Army.  Plaintiff has successfully performed as an Information Technology Specialist with the Department of the Army.

26.    Plaintiff has been diagnosed as having constrictive bronchiolitis obliterans.  Plaintiff believes that his medical condition is going to progressively get worse to the point where it can become fatal in the next few years.  Plaintiff is limited in his ability to walk and breathe.

27.    The position to which plaintiff was hired did not require the technician to provide technology services throughout the Lyons Campus, including all patient areas.

28.    The agency's position description for the ITS position plaintiff occupied did not validly state:

The nature of the work requires walking to all areas of the campus to which assigned.  It also requires standing and bending for significant periods to make repairs or adjustments to equipment, and the lifting and moving of devices weighing up to 50 pounds on a regular basis is required.

These were not the essential functions of plaintiff's position.

29.    Plaintiff could have performed the essential functions of his position, with or without reasonable accommodation.

30.    Plaintiff was performing the essential functions of his position all along, without a problem.

31.    On October 4, 2004, during Mr. Sharif's first meeting with the section, after replacing Ms. Wally as the section supervisor, Mr. Sharif informed the technicians in the section, including

plaintiff, that plaintiff would be working in Circle One due to plaintiff's health condition and that it would be hazardous to plaintiff's health to have to go near patients who had lung problems. After that meeting, plaintiff asserts that Mr. Sharif advised him to go to a doctor and get a note stating his limitations.

32.     On October 14, 2004, after he presented the October 8, 2004, note to Mr. Sharif and one week after the initial section meeting, Mr. Sharif reversed his position on plaintiff's work assignments and advised the technicians, including plaintiff, at another meeting that plaintiff would be stationed in the nursing home near sick patients. Plaintiff told Mr. Sharif that it if he got lung disease from any of the patients it would kill him.

33.     At the meeting on October 14, 2004, plaintiff told Mr. Sharif that it if he got lung disease from any of the patients it would kill him. Mr. Sharif said he did not care and that plaintiff has to the nursing home anyway. At this meeting, Mr. Sharif was angry and yelled at plaintiff.

34.     Plaintiff meets the definition of a qualified disabled person.

35.     Plaintiff's presence on duty did not place him at great risk of further harm.

36.     Plaintiff could have performed sufficient work, even with an accommodation.

37.     During his employment, plaintiff worked in all areas.

38.     A reasonable accommodation would not have placed an undue burden on others and impact the agency's mission.

39.     The agency did not act consistently with its Reasonable Accommodation Policy.

40.     Plaintiff was qualified for the position that he held, both in terms of experience and education.

41.     Mr. Sharif was hostile towards plaintiff, that a couple of times he thought Mr. Sharif was going to attack him, that the hostility began in October 2004 and became increasingly worse, that he believes Mr. Sharif's hostility was related to his disability and that Mr. Sharif made two comments which were negative about disabilities, once when Mr. Sharif allegedly told plaintiff that cannot do anything because he is disabled and another time when he said something about another worker's vision problem.

42.     On one occasion, in February 2005, when Mr. Sharif had plaintiff moving equipment in a storage room, Mr. Sharif started sweeping with a broom. Plaintiff construed this as a direct attack by Mr. Sharif against him and an act of retaliation.

43.     Mr. Sharif was promoted to be supervisor of plaintiff's section from a non-

supervisory position. Mr. Sharif had two "blow ups" with plaintiff during the time he supervised plaintiff, one of which occurred on October 15, 2004. Mr. Stoner was aware of these incidents in which Mr. Sharif raised his voice to plaintiff. Mr. Stoner looked into the incidents. In response to these incidents, Mr. Stoner testified that he counseled Mr. Sharif, assigned him a mentor and had him take supervisory training.

44.     The following additional actions were taken against plaintiff on the basis of his disability and in reprisal for engaging in protected activity:

a.     On October 14, 2004, Mr. Sharif disregarded Nurse Practitioner Ramirez' note and assigned plaintiff to a patient area all day and made insensitive comments and told plaintiff he could not go to the EEO or Union office.

b.     On October 15, 2004, Mr. Sharif yelled and screamed at plaintiff after plaintiff told him that Ms. Erhardt instructed him to stay in the office.

c.     The agency placed calls to plaintiff's former employers on or about November 5, 2004 and thereafter.

d.     During the week of March 14, 2005, plaintiff requested the construction of a ramp to facilitate access of his scooter.

e.     In a memo dated March 24, 2005, Mr. Stoner denied plaintiff's request for a ramp.

f.     Mr. Sharif directed plaintiff, on March 29, 2005, to carry old equipment up and down stairs.

g.     Mr. Sharif directed plaintiff, on March 30, 2005, that he was to check in at Building 11 each morning.

h.     Jenny Liu, M.D., M.S., the Employee Health Physician, stated, in a Memorandum, dated November 5, 2004, that "[plaintiff's] accommodation request would require him to be removed from his essential function as an IT specialist. Due to the limited medical information and clinical assessment, a full evaluation cannot be made at this time."

I.     Mr. Stoner's instruction to plaintiff, on April 14, 2005, that plaintiff must see Mr. Sharif the first thing every morning notwithstanding plaintiff informing Mr. Stoner that he was concerned Mr. Sharif was going to start an altercation with him.

j.     The memo from Mr. Stoner, dated April 20, 2005, which questioned plaintiff's educational credentials and advised him that the matter was being referred to OPM, that his network access was reduced, and that he would be reassigned.

-11-

k.   The (April 20, 2005, time-frame) reassignment to duties outside his position description and direction that he report to his supervisor each morning.

l.   Plaintiff's submission to Mr. Stoner, on April 25, 2005, of a certificate of completion of a training course which the VA sent him to and was paid for under the Vocational Rehabilitation Program.

m.   The DVA, immediately thereafter, contacting plaintiff's former employers for a third time, in order to determine his credentials;

n.   The memo, dated April 29, 2005, from Mr. Mizrach, Director of VANJHCS, offering plaintiff two positions on the East Orange Campus which required typing skills.

o.   The letter of May 10, 2005, from Mr. Stewart, advising plaintiff that he was being terminated because he could no longer perform the essential functions of his position, with or without reasonable accommodation.

p.   The amended letter of termination, dated May 13, 2005, in which plaintiff's termination became effective May 24, 2005.

q.   On or about May 4, 2005, plaintiff's supervisor took his keys for the storeroom where he kept his scooter and battery charger.

45.   Although plaintiff could walk to different buildings, he believed that a scooter would enable him to do so faster.

46.   Although he was able to walk to all areas, plaintiff needed the accommodation of both the scooter to better get to the areas assigned and a ramp to get in and out of the building with the scooter.

47.   An assignment to Circle I would have been more than feasible.

48.   When plaintiff told Mr. Sharif that an assignment to the Nursing Home could kill him, Mr. Sharif stated he "did not care.  You're going anyway."

49.   The agency summarily denied plaintiff's request for reasonable accommodation in November, 2004, without any follow-up.

50.   Other than the medical documentation that plaintiff provided, defendant did not ask plaintiff for any additional medical documentation.

51.   Management never asked plaintiff for additional medical documentation.

52.     On one occasion, Mr. Sharif told plaintiff "You can't do anything because you are disabled."

53.     Most of Mr. Sharif's hostility was directed at plaintiff and another disabled computer specialist, Vincent Mileto.

54.     On April 25, 2005, plaintiff provided Mr. Stoner with a certificate showing that he had successfully completed the school that the agency approved and paid for.

55.     In a memo dated April 20, 2004 (sic), Assistant Chief Stoner questioned plaintiff's educational credentials.  In doing so, the agency advised plaintiff that it was referring the matter to the Officer of Personnel Management "for further review."  Assistant Chief Stoner further stated "Since OPM's determination may result in the termination of your employment with our agency, it has been decided to reduce your network access immediately."  As a result, the agency reassigned plaintiff to a placement that "does not require the higher level access until further notice."  Plaintiff was then reassigned to duties outside his position description. The agency, at this time, also directed that plaintiff report to his supervisor each morning.

56.     Plaintiff does not believe that he would have obtained a typing certification.

57.     Plaintiff had more experience and more computer schooling that anyone in his section.

58.     Plaintiff's 90-day competency assessment dated November 9, 2004 was satisfactory.

59.     No other technician was questioned about their schooling.

60.     The majority of the computers and people are in Circle I.  Approximately 75% of the assigned work is in Circle I.

61.     There was plenty of work for plaintiff to do in Circle I.

62.     All alternative positions that defendant offered plaintiff were lower grade positions with lower pay and would have involved plaintiff being relocated to a different facility.

63.     The agency did not question plaintiff's online university when he was hired, although it was on his application.  It was only immediately after engaging in protected activity in April, 2005 that the agency questioned it.

B.     *Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).*

<u>Compensatory Damages</u>

Plaintiff seeks the sum of $300,000 as compensatory damages. As a result of defendant's actions, plaintiff suffered severe depression. He was treated by a mental health professional and an anti-depressant was prescribed. Plaintiff also suffered severe neck pain as a result of mental distress. The medication Tramadol was prescribed as the result. Plaintiff also exhibited other manifestations of emotional distress such as anxiety. He also lost career advancement potential by being terminated.

<u>Back Pay and Other Benefits</u>

At the time that plaintiff was dismissed, in May, 2005, he was earning approximately $54,000 per year. He was unemployed from May, 2005 to November, 2005, a period of approximately six months. During this time, plaintiff lost the full value of his salary, which equaled approximately $27,000.

Plaintiff became employed by the Internal Revenue Service ("IRS") on November 14, 2005. Plaintiff earned approximately $59,000 per year. He was employed in the same title as he was with defendant. However, plaintiff was hired into a GS-11 position. If he was still employed by defendant, at the time, he would have been a GS-13. He was dismissed from defendant three weeks before he would have become a GS-9. Thus, plaintiff claims the difference between a GS-9 and a GS-11 for the period that he was unemployed. While at the IRS, plaintiff was employed in a term position not to exceed two years. He had no job security and could have been let go at any time. Plaintiff's employment with the IRS ended in April, 2007.

Plaintiff then became employed by the Department of the Army in April, 2007, where he currently serves as a GS-11, Step 4. However, he continues to be a term employee and expects to lose his job in a matter of a few months when his base closes. At that time, plaintiff very well may be unemployed. He, therefore, seeks appropriate front pay as well. Plaintiff's potential losses, up until November, 2009, are $115,884.

Plaintiff also seeks the restoration of all benefits lost as a result of being dismissed. This includes, Thrift Savings Plan (TSP), life insurance benefits and sick and annual leave. When plaintiff loses his job, he will lose his life insurance roughly worth $420,000 but, if he was at a GS-14, Step 2, his potential life insurance would be roughly worth $600,000.

Plaintiff calculates his lost income as follows:

| POTENTIAL | | | ACTUAL | | |
| --- | --- | --- | --- | --- | --- |
| Date Range | Grade | Potential Salary | Date Range | Grade | Actual Earnings |

| 06/01/2005-12/31/2005 | GS-11 Step 1 | $32,987 | 06/01/2005-11/12/2005 | Unemployed | $11,066 |
| | | | 11/13/2005-12/31/2005 | GS-11 Step 1 | $4,712 |
| 01/01/2006-05/31/2006 | GS-11 Step 1 | $24,057 | 01/01/2006-11/12/2006 | GS-11 Step 1 | $52,925 |
| 06/01/2006-12/31/2006 | GS-12 Step 1 | $39,711 | 11/13/2006-12/31/2006 | GS-11 Step 2 | $4,972 |
| 01/01/2007-05/31/2007 | GS-12 Step 1 | $29,222 | 01/01/2007-11/12/2007 | GS-11 Step 2 | $55,619 |
| 06/01/2007-12/31/2007 | GS-13 Step 1 | $48,651 | 11/13/2007-12/31/2007 | GS-11 Step 3 | $5,219 |
| 01/01/2008-05/31/2008 | GS-13 Step 1 | $36,131 | 01/01/2008-11/12/2008 | GS-11 Step 3 | $59,488 |
| 06/01/2008-12/31/2008 | GS-14 Step 1 | $59,774 | 11/13/2008-12/31/2008 | GS-11 Step 4 | $5,577 |
| 01/01/2009-05/31/2009 | GS-14 Step 1 | $44,490 | 01/01/2009-11/12/2009 | GS-11 Step 4 | $63,923 |
| 06/01/2009-12/31/2009 | GS-14 Step 1 | $64,363 | 11/13/2009-12/31/2009 | | |

| Year | Potential Earnings | Actual Earnings | Difference |
| --- | --- | --- | --- |
| 2005 | $32,987 | $15,778 | $-17,209 |
| 2006 | $63,768 | $57,896 | $-5,872 |
| 2007 | $77,873 | $60,838 | $-17,035 |
| 2008 | $95,905 | $65,065 | $-30,840 |
| 2009 | $108,853 | $63,923 | $-44,930 |
| **TOTAL** | | | **$-115,884** |

Attorney Fees

Plaintiff seeks the payment of reasonable attorney fees.

Equitable Relief

Plaintiff seeks reinstatement into a GS-13 ITS position with all reasonable accommodations originally requested.

**5.     *Defendant's Contested Facts* (State separately for each defendant. See instructions above.)**

*A. Defendant intends to prove the following contested facts with regard to liability.*

1.   Plaintiff's diagnosed medical condition of Severe COPD/constrictive bronchilitis has been a presumed diagnoses at the VANJHCS and has never been conclusively determined.

2.   The agency's position description for the ITS position plaintiff occupied stated the following "Physical Demands":

> The nature of the work requires walking to all areas of the campus to which assigned.  It also requires standing and bending for significant periods to make repairs or adjustments to equipment, and the lifting and moving of devices weighing up to 50 pounds on a regular basis is required.

3.   The position to which plaintiff was hired required the technician to provide technology services throughout the Lyons Campus, including all patient areas.

4.   When plaintiff began working in the Tech Section he was not using oxygen to assist his breathing.

5.   Ms. Everhardt received plaintiff's accommodation request in mid-October 2004.  Upon receiving the request, Ms. Everhardt contacted the VANJHCS Human and Learning Resources Service.  That office then reviewed the request and forwarded it to the agency Employee Health Physician for review.  In view of the medical documentation provided by plaintiff, which indicated that plaintiff could not perform the essential physical demands of his position, and for plaintiff's own safety, Ms. Everhardt instructed plaintiff to take leave while his request for accommodation was being considered.

6.   As part of the consideration of plaintiff's reasonable accommodation request, Jenny Liu, M.D., M.S., the Employee Health Physician, reviewed plaintiff's job description and issued a Memorandum, dated November 5, 2004.

7.  From the time plaintiff returned to his ITS position in November 2004, until he was terminated from that position, plaintiff did not provide the agency with any additional medical documentation, beyond Nurse Practitioner Ramirez's October 8, 2004, note and reasonable accommodation assessment, for the agency to consider relative to plaintiff's request for reasonable accommodation.

8.  In a memorandum, dated April 29, 2005, the Director of the VANPHCS, Kenneth Mizrach, reiterated that plaintiff had been advised by Ms. Everhardt that it had been determined that he could not perform the essential functions of his position and that he had been encouraged to provide additional medical documentation for consideration, but failed to do so.

9.  Consistent with the VANJHCS's Reasonable Accommodation Policy, VANJHCS conducted a full review of all vacant positions to reassign plaintiff to a vacant position which was conducive to his limitations.   Such a review was made and it was determined that plaintiff could be placed in the following vacant positions as an accommodation based upon his physical limitations: Program Support Assistant, GS-6, OPMI, East Orange, New Jersey, Campus (2 vacancies) and Program Support Assistant, GS-7, Research Service, East Orange, New Jersey Campus.   Mr. Mizrach advised plaintiff of this accommodation attempt in his April 29, 2005, memorandum to plaintiff.   In that memorandum, Mr. Mizrach informed plaintiff that the positions required a qualified typist, that plaintiff would be required to submit a certification declaring his typing qualifications for the position, that placement in the positions is immediate, and that the physical requirements of the positions were consistent with the limitations articulated by plaintiff's health care provider.

10.  Plaintiff rejected the agency's offer of accommodation by reassignment to the vacant positions.

11.  The Tech Section's move from Building 8 to Building 11 was part of an ongoing and larger project at the Lyons Campus to integrate all sections at that health care facility and that Tech Section happened to be the last section to be moved as part of that integration effort.   One year prior to the Tech Section's move to Building 11, the building was scheduled to have a ramp installed, however, the ramp was not constructed due to a shortage of funds.

12. Plaintiff's request for the construction of a ramp was forwarded to the Associate Director of VANJHCS.   Construction of the ramp was authorized.   The ramp was completed in June of 2005.

-17-

13.  Within plaintiff's first month of employment, plaintiff's handling of certain projects caused Mr. Stoner to question whether plaintiff had the experience and education he said he did on his application for employment.  Mr. Stoner hired plaintiff and had interviewed plaintiff for the position.  The resume plaintiff submitted to VANJHCS as part of his application for the position stated that he was awarded a B.S. in Computer Information Technology, in December 2003, from MacAuther University.

14.  Mr. Nafis and Ms. Walley, plaintiff's two first-line supervisors during the time he was employed, also had questions/concerns about plaintiff's performance. Like Mr. Stoner, Mr. Nafis' concerns caused him to question plaintiff's credentials.

15.  Mr. Stoner raised his concerns concerning plaintiff's experience and education to the VANJHCS human resources office. Mr. Stoner raised his concerns to the human resources office out of a concern that plaintiff's IT work on technical equipment used by medical staff could potentially put patient care at risk.

16.  Human Resources, not Mr. Stoner, made calls to plaintiff's prior employers in an effort to verify plaintiff's experience.  Plaintiff's stated experience was not sufficiently verified.

17.  The human resources office also looked into the legitimacy of plaintiff's alleged Bachelor of Science degree from MacAuther University.  It was determined that MacAuther University was a "paper-mill school" and not an accredited institution.  In view of plaintiff's use of this alleged degree to support his educational background on his application for employment and his unverified experience stated on his application for employment, the matter was referred the United States' Office of Personnel Management for review and, based upon a recommendation from the NJVAHCS's information security officer Kathy DeVierno, plaintiff's computer network access was taken away.

18.  In a memorandum, dated April 20, 2005, Mr. Stoner advised plaintiff that throughout the federal government there has been an added emphasis on confirming whether the higher education claimed by candidates and employees comes from accredited institutions, that MacAuther University does not appear to meet the requirements for an accredited institution, that the VA is required to refer its concerns about plaintiff's claimed degree to OPM and that, since OPM's determination may result in the termination of his employment with the VA, his access to the agency's network had been reduced.

19.   On or about April 20, 2005, coinciding with and as a result of the suspension of plaintiff's access to the computer network, plaintiff was assigned to work directly under Mr. Stoner. Subsequently, Mr. Stoner assigned plaintiff projects. Initially, once plaintiff's access was suspended, Mr. Stoner contemplated assigning plaintiff to the medical media section in IRM, however, he chose to have plaintiff work directly him instead.

20.   On or about May 4, 2005, Mr. Stoner had plaintiff return keys to the storeroom where plaintiff had kept his scooter and battery charger prior to the Tech Section's move to Building 11. Mr. Stoner made the decision to take the storeroom keys back from plaintiff at that time because another technician needed the key to access the storeroom.   At that time, Mr. Stoner was assigning projects directly to plaintiff, the scooter was being stored by plaintiff's desk in Building 11, and plaintiff, whose access to the network had been suspended, did not need to use the scooter for the work assigned to him.

21.   Plaintiff worked under his first line supervisor, Mr. Sharif, from the time plaintiff returned to the work in early November 2005, after the agency denied his request for reasonable accommodation to work in Circle One only, until he was reassigned, on or about April 20, 2005, to work on projects directly under Mr. Stoner.   During that time period, plaintiff and his coworkers, Mr. Valente and Mr. Mileto, exchanged assignments/work orders, which had been assigned by Mr. Sharif, with plaintiff so that plaintiff would not have to go to patient areas.   Under this arrangement, plaintiff's coworkers, plaintiff would take Mr. Valente's and Mr. Mileto's office area assignments and they would take those assignments given to plaintiff which would have required him to go to patient areas.

22.   On May 23, 2005, prior to the effective date of plaintiff's termination, but after the agency had issued him the letter of May 13, 2005, Mr. Mizrach, the Director of the NJVAHCS, met with plaintiff to explore the possibility of placing plaintiff in a new IT position, at the GS-9 level, that would be developed to accommodate plaintiff's medical restrictions.   Plaintiff declined to accept Mr. Mizrach's offer.

23.   The only claims in this lawsuit on which plaintiff exhausted his administrative remedies, through the agencies administrative EEO process, are 1) his claims of disability discrimination relating to the allegation that the agency denied him reasonable accommodation and 2) his claims of disability discrimination and reprisal relating to a supervisor's instruction and assignment of work occurring on April 20, 2005, an offer of

lower graded positions on April 29, 2005, the removal of his
storage room keys on May 4, 2005, and the termination of his
employment during his probationary period.

24.   Plaintiff was not qualified to perform the essential
functions of his job, with or without reasonable accommodation.

25.   Plaintiff could not perform the essential functions of
his position even with an accommodation.

26.   According to plaintiff's health care practitioner, he was
not able to 1) have direct contact with patients or patient areas
with airborne problems, 2) walk long distances, 3) be exposed to
extreme temperature changes, and 4) climb stairs.    These
limitations imposed by plaintiff's imposed by his medical provider,
which were endorsed by plaintiff and never disavowed by plaintiff
or his care giver, prevented plaintiff from performing the
essential functions of his ITS position.

27.   The essential functions plaintiff could not perform
because of his medical limitations included, among other things, 1)
performing IT work in areas of the Lyons Campus where he would have
direct contact with patients, 2) physically exerting himself by
lifting, moving heavy equipment on a regular basis, as well as
walking, talking, standing and bending for significant periods, and
3) performing IT work in all areas of the Lyons Campus.
Additionally, plaintiff refused to perform these essential
functions.

28.   Many of the events or actions upon which plaintiff's
discrimination claim is based are trivial workplace incidents which
do not amount to material adverse personnel actions.

29.   The actions at issue in plaintiff's Complaint were taken
by defendant for legitimate, nondiscriminatory reasons:
1) plaintiff was justifiably terminated during his probationary
period because he was unable to perform the essential functions of
his position with or without accommodation and because the agency
could not place him in a suitable reassignment position; 2) Ms.
Erhardt, plaintiff's third-line supervisor, instructed plaintiff to
take leave for his own safety in mid-October 2004, while his
request for accommodation was being considered, in view of the
medical documentation plaintiff submitted which indicated that
plaintiff could not perform the essential functions of his
position; 3) the agency handled plaintiff's request for reasonable
accommodation in accordance with its procedures; 4) the agency
properly denied plaintiff's request for reasonable accommodation to
work only in Circle One because the agency determined, after a

review of the matter by the agency's Employee Health Physician, that plaintiff could not perform the essential functions of his position; 5) in accordance with the agency's reasonable accommodation policy, the agency surveyed vacant positions for which plaintiff could perform within his physical limitations and offered him positions; 6) the DVA placed calls to plaintiff's prior employers to verify his experience and educational credentials in accordance with its normal qualifying procedures; 7) Mr. Stoner forwarded his concerns about plaintiff's educational and experience credentials to the human resources office after plaintiff's handling of certain assignments called into question plaintiff's credentials and out of a concern that plaintiff's IT work on technical equipment used by medical staff could potentially put patient care at risk;  8) the agency determined that MacAuther University, the institution plaintiff listed in his resume/application as awarded him a B.S. in a technical field, was a "paper mill school" and not an accredited institution; 9) in view of plaintiff's use of a bogus college degree to support his educational background and employment application and his unverifiable employment experience, the agency referred the matter to the Office of Personnel Management; 10) the agency suspended plaintiff's computer network access, in view of the inquiry into his stated educational background and work experience and in accordance with the recommendation from the agency's institutional security officer; 11) subsequent to the agency's suspension of plaintiff's computer network access, Mr. Stoner, plaintiff's second line supervisor, assigned plaintiff to work directly under him on projects in Building 11; 12) in early 2005, the Tech Section, the section in which plaintiff worked, moved from Building 8, which was a handicap access building, to Building 11, which was a non-handicap access building, as part of an ongoing and larger project at the Lyons Campus to integrate all sections at that health care facility; 13) the agency had intended the year before the move to Building 11 to install a handicap ramp at that building, but did not do so because of a lack of funds; 14) after plaintiff made a request that the agency construct a ramp at Building 11, the agency authorized the funds for one and built it (although the ramp was not completed until June 2005); and 15) the agency terminated plaintiff from his position only after plaintiff denied the agency's offer of reassignment to plaintiff and after plaintiff refused to accept an offer of the possibility of placing plaintiff in a new IT position that would be developed to accommodate plaintiff's medical restrictions.

     30.  Plaintiff cannot establish that the agency's reasons for its actions at issue in the Complaint were not the true reasons and that unlawful discrimination was the real reason.

31.   Limiting plaintiff's assignments to Circle I was not a possible reasonable accommodation.

32.   Plaintiff cannot establish that reasonable accommodation was possible.

33.   Even an assignment to the non-patient care areas of Circle I would not have safeguarded plaintiff from possible airborne infections.

34.   The accommodation plaintiff insisted upon - assignments to Circle I only - was unreasonable.

35.   Plaintiff could not perform the job without a risk of harm to himself.

36.   The job could not be made safe from the risk of harm posed to plaintiff without undue hardship on the agency.

37.   Because the Lyons Campus was a medical center with patients throughout it was not feasible to have plaintiff work in Circle I only.  Airborne infections could be found in Circle I as well as other areas of the Lyons Campus.

38.   Limiting plaintiff to work in Circle I, as plaintiff requested, would have severely impacted the daily functioning of the IRM and the medical center.

39.   The agency acted consistently with its Reasonable Accommodation policy.

40.   Plaintiff did not supply any additional medical documentation to support his request for reasonable accommodation beyond the note from Nurse Ramirez and the statements from  Nurse Ramirez made in his written accommodation request.

41.   The agency did provide an accommodation of last resort to plaintiff by offering plaintiff assignment to vacant positions.

42.   Plaintiff did obtain a scooter and the agency did install a ramp at Building 11.

43.   Plaintiff did not comply with the agency's Reasonable Accommodation Policy concerning his request for accommodation.

44.   Plaintiff was not exposed to a hostile work environment.

45.   None of the actions at issue in the Complaint were

instances of intentional discrimination.

46.   None of the actions at issue in the Complaint were taken for a discriminatory reason.

47.   Plaintiff was not subjected to a severely and pervasively abusive work environment.

48.   The agency did not retaliate against plaintiff for his EEO protected activity.

49.   There is no causal link between plaintiff's EEO protected activity and the actions at issue in plaintiff's reprisal claim.

50.   A number of the events at issue in plaintiff's reprisal claim do not amount to material adverse personnel actions.

51.   The agency terminated plaintiff's employment in accordance with policy and regulations applicable to probationary employees.

52.   Plaintiff's use of a bogus college degree and the questions raised concerning his experience caused the loss of his access to the agency's computer network, made him a risk, would have prevented plaintiff from continuing employment with the agency in his position and would have led to his eventual termination of employment with the agency.

*B.   Defendant intends to prove the following contested facts with regard to damages.   (This statement must include the factual basis for each defense against plaintiff's claims of damages).*

1.   Based upon the information available to defendant's medical expert, Dr. Alan R. Pope, he is unable to identify that plaintiff has a significant respiratory impairment to a reasonable degree of medical certainty and that it is his professional opinion, to a reasonable degree of medical certainty, that there is no objective evidence of ongoing respiratory disease or an irreversible respiratory impairment based on available data. Plaintiff has provided no expert report concerning his alleged disabling condition.

2.   Dr. Connell, a VANJHCS health care provider, stated in a sworn declaration, dated February 21, 2008, among other things, that plaintiff's diagnosis of constrictive bronchiolitis has been a presumed diagnosis with plaintiff at the VANJHCS, the diagnosis has never been conclusively determined, that the pulmonary function

test in itself is not harmful, that it can be easily aborted, and that she never advised plaintiff that it would be harmful to his health to undergo a pulmonary function test.

3. Plaintiff refused to submit to a pulmonary function test by defendant's expert.

4. Plaintiff engages in weight lifting and/or cardiovascular exercise on a daily basis.

5. Plaintiff has not provided any records concerning his claim of treatment with a mental health professional.

6. Plaintiff has not provided any expert report supporting his claim that he suffered mental health issues as a result of defendant's actions.

7. Plaintiff has not treated with a mental health professional on a regular basis.

8. Plaintiff's use of a bogus college degree and the questions raised concerning his experience caused the loss of his access to the agency's computer network, made him a risk, would have prevented plaintiff from continuing employment with the agency in his position and would have led to his eventual termination of employment with the agency at the end of his probationary period.

9. No reasonable basis exists, in view of the suspension of plaintiff's access to the agency's computer network and the referral of the matter of his bogus college degree and unverified experience, to expect that he would have continued employment with the agency beyond the end of his probationary period.

10. Plaintiff's claims for compensatory damages, back pay, other benefits, attorney's fees and equitable relief are unsupported and without basis.

11. According to defendant's medical expert report and plaintiff's exercise regime, plaintiff is able to perform more physically demanding work.

12. Plaintiff failed to mitigate his damages.

13. If defendant is found to have discriminated against plaintiff in the termination of his employment, plaintiff is not entitled to lost wages.

14.   Plaintiff collects VA benefits from the government for his service connected disability.

**6.**   *Plaintiff's Witnesses (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial.)*

*A.*   *On liability, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:*

1.   Nicholas Valente
Information Technology Specialist
Department of Veterans Affairs
Lyons Campus
Lyons, New Jersey

Mr. Valente was plaintiff's coworker. He can testify that plaintiff was doing a good job and that plaintiff's knowledge base was better than his. He can testify that, during a meeting, Mr. Sharif informed all technicians that plaintiff would be working in non-patient areas and then approximately a week or so later, during another meeting, he informed plaintiff that he would be assigned to the nursing home area. He will testify that he and another employee assisted plaintiff with his work orders for the nursing home area. Mr. Valente can also testify that, on occasion, he heard Mr. Sharif yelling at plaintiff. He also heard plaintiff tell Mr. Sharif that he was to be receiving his GS-11 promotion in a few months. In response, Mr. Valente heard Mr. Sharif words to the effect "You know you are disabled, you can't do a lot of work, so maybe you don't deserve an 11."

2.   Vincent Mileto
Information Technology Specialist
Department of Veterans Affairs
Lyons Campus
Lyons, New Jersey

Mr. Mileto was plaintiff's coworker. He can testify that when plaintiff first started working, his assignments were confined within the perimeter of Circle I and he did not go where patients are more ill. This changed, he will testify, when Mr. Sharif became the supervisor. Mr. Mileto can also testify that he witnessed Mr. Sharif yelling at plaintiff. He will also testify that he once heard Mr. Sharif make a statement to plaintiff that "If you can't do the job because of a disability, you shouldn't be promoted." Mr. Mileto will testify that he too is disabled and that Mr. Sharif seemed to yell at him and plaintiff more than the others.

3.   Thomas Pacheco
Deputy G6
78th Operations Group

-25-

U.S. Army Reserve
Department of the Army
91 Truman Drive South
Edison, New Jersey 08817-2487

Mr. Pachecco is plaintiff's current supervisor with the Department of the Army. He can testify to plaintiff's work performance and qualifications. He will also testify that plaintiff is a term-employee who will be separated within the next few months.

4.    Ruth Ramirez, NP
Department of Veterans Affairs
Lyons Campus
Lyons, New Jersey

Ms. Ramirez is the individual who with whom plaintiff consulted and who issued a recommendation that plaintiff be reasonably accommodated.

5.    Plaintiff will testify on his own behalf, both as to liability and damages.

B.    *On damages, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:*

Refer to 6(A) above.

C.    *Defendant objects to the following witnesses for the reasons stated:*

Defendant has no objections.

7.    **Defendant's Witnesses**. *(See instructions above.)*

A.    *On liability, defendant intends to call the following witnesses who will testify in accordance with the following summaries:*

1) Delores Carpenter, former Human Resources Staffing Assistant, VANJHCS, - Ms. Carpenter, while working in human resources for the agency, determined that plaintiff was qualified for the Information Technology Specialist position based upon his prior experience. It is anticipated that Ms. Carpenter, among other possible topics, will testify in accordance with the transcribed testimony she gave on August 3, 2005 during the investigation of plaintiff's EEO complaint. It is anticipated that she will state that she qualified plaintiff for his position based upon his experience; plaintiff never told her that he had a disability; the agency does not recognize on-line college degrees from unaccredited institutions; she made inquiries to plaintiff's prior employers; incidents where employees lie on their applications are referred to OPM; and she told management that plaintiff was qualified at the GS-9 level, but not the GS-11 level.

2) Patricia Connell, M.D, VANJHCS - It is anticipated that Dr. Connell will testify in accordance with her Declaration, dated February 21, 2008. It is anticipated that, among other possible topics, she will testify about her contact with plaintiff, the reasons for and the circumstances of her note of February 12, 2008, her review of plaintiff's medical records and any treatment she provided plaintiff.

3) Kathy DeVierno, Information Security Officer, VANJHCS - It is anticipated that Ms. DeVierno will testify, among other possible topics, that she recommended that management restrict plaintiff's computer access after she learned of alleged discrepancies on the employment application submitted by plaintiff concerning plaintiff's educational background and his work experience. It is anticipated that Ms. DeVierno will explain the reasons for her recommendation and discuss whether plaintiff met and/or would be able to meet the security requirements for his position in view of the discrepancies on his employment application concerning his educational background and work experience.

4) Beverly Erhardt, former Chief, IRM, VANJHCS - It is anticipated that Ms. Erhardt will testify, among other possible topics, in accordance with the transcribed testimony she gave on July 19, 2005, during the investigation of plaintiff's EEO complaint. It is anticipated that Ms. Erhardt will testify that she did not purposely discriminate or retaliate against plaintiff. It is anticipated that Ms. Erhardt will discuss her pre-employment interview of plaintiff and the decision to hire plaintiff; describe her handling of plaintiff's request for reasonable accommodation; discuss her decision that plaintiff could not perform the essential functions of his position; discuss her letter to plaintiff, dated November 5, 2004; describe the essential functions of plaintiff's position; provide legitimate non-discriminatory reasons for some of the actions at issue; and discuss the requirement that the IT specialists must go to any area of the Lyons Campus, the work of the IRM and the Tech Section, the reason for the movement of the Tech Section from Building 8 to Building 11, and the eventual construction of the ramp for Building 11.

5) Nancy Hamilton, Supervising Human Resource Specialist, VANJHCS - It is anticipated that Ms. Hamilton, among other possible topics, will testify about plaintiff's bogus college degree and unverifiable experience; discuss the actions taken by the agency to look further into the matter of plaintiff's college degree and experience after he was hired; state that plaintiff may not be qualified for his position due to the plaintiff's bogus college degree and unverifiable experience; discuss the OPM guidance on and involvement on this issue; and discuss the agency's referral of the matter to OPM.

6) Jeffrey Harley, former EEO Manager, Alternate Dispute Coordinator, VANJHCS - When Mr. Harley was the agency's Equal Employment Opportunity Manager, Alternate Dispute Resolution Coordinator, plaintiff came to him concerning his request for reasonable accommodation. It is anticipated that Mr. Harley, among other possible topics, will testify in accordance with the transcribed testimony he gave on August 3, 2005, during the investigation of plaintiff's EEO complaint. It is anticipated that Mr. Harley will testify about his interaction with plaintiff, the agency's reasonable accommodation policy and discussions with management regarding plaintiff's

request for accommodation.

7) Toni Hindsman, EEO Manager, VANJHCS - It is anticipated that Ms. Hindsman will testify, among other possible topics, as to the agency's reasonable accommodation policy, plaintiff's requests for reasonable accommodation, the agency's handling of plaintiff's requests for reasonable accommodation, plaintiff's EEO complaint at issue in this matter, the agency's handling and processing of plaintiff's EEO complaint.

8) Jenny Liu, M.D., M.S., Employee Health Physician, VANJHCS - Dr. Liu, the agency's employee health physician, reviewed plaintiff's medical restrictions, request for accommodation and job description after plaintiff submitted his request for accommodation. It is anticipated that Dr. Liu will testify, among other possible topics, in accordance with her Memorandum, dated November 5, 2004, and her written denial of plaintiff's accommodation request, in which she determined that accommodation would require the removal of an essential function of plaintiff's job as an IT specialist.

9) Vincent Mileto, Computer/IT Specialist, Tech Section, IRM, VANJHCS - Mr. Mileto was another computer or IT specialist who worked in the same section as plaintiff. It is anticipated that Mr. Mileto, among other possible topics, will testify in accordance with the transcribed testimony he gave on July 25, 2005, during the investigation of plaintiff's EEO complaint. It is anticipated that Mr. Mileto will testify about his observations of Mr. Sharif as a supervisor, Mr. Sharif's interactions with plaintiff, his belief that Mr. Sharif did not treat him any better than he treated plaintiff and how he and another coworker, Mr. Valente, did work assignments for plaintiff in patient areas and, in exchange, gave plaintiff office area assignments.

10) Kenneth Mizrach, Director, VANJHCS - Mr. Mizrach issued a letter to plaintiff, dated April 29, 2005, in which plaintiff was offered vacant positions as an accommodation to plaintiff's physical limitations and, a day or so before plaintiff's removal became effective, Mr. Mizrach offered to create a computer help-desk position for plaintiff. It is anticipated that Mr. Mizrach, among other possible topics, will testify in accordance with the transcribed testimony he gave on July 21, 2005/July 28, 2005, during the investigation of plaintiff's EEO complaint. Further, it is anticipated that Mr. Mizrach will state that the agency did not engaged in prohibited discrimination or reprisal, provide legitimate non-discriminatory reasons for some of the agencies actions, state that the agency offered positions to plaintiff in an effort to accommodate him, describe the agency's effort to put a ramp on Building 11, discuss the agency's determination that plaintiff could not perform the essential functions of his position, with or without reasonable accommodation.

11) Michael Novello, IT Specialist, in Tech Section, IRM, VANJCHS - Mr. Novello was another computer or IT specialist who worked in the same section as plaintiff. It is anticipated that, among other possible topics, he will testify in accordance with the transcribed testimony he gave on July 25, 2005, during the investigation of plaintiff's EEO complaint. It is anticipated that Mr. Novello will discuss the environment in the Tech Section, the mission and duties of the section and the requirements of the job plaintiff held; discuss his observations of Mr. Sharif as a supervisor and

plaintiff; and state that he never witnessed Mr. Sharif say anything derogatory about anyone's disability in the Tech Section.

12) Sandra Oker, EEO Counselor, Office of Resolution Management - It is anticipated that Ms. Oker, among other possible topics, will testify about her counseling of plaintiff's EEO complaint, the allegations raised by plaintiff in his informal and formal complaints, the processing of his complaint and the acceptance and/or rejection of plaintiff's EEO complaint.

13) First Sergeant Miller Perry - First Sergeant Perry was identified by plaintiff as his supervisor during the time he was in the United States Marine Corps. It is anticipated that, among other possible topics, defendant will question First Sergeant Perry about plaintiff's computer related experiences in the Marine Corps and the representations made on documents submitted by plaintiff to the agency.

14) Ruth F. Ramirez, Nurse Practitioner, VANJHCS - It is anticipated that Ms. Ramirez, among other possible topics, will testify in accordance with her note of October 8, 2004, in which she described plaintiff's limitations, and the statements she made on plaintiff's written request for reasonable accommodation. Further, it is anticipated that she will discuss the basis for her medical conclusions, any treatment she provided plaintiff and her observations of plaintiff.

15) Nafis Sharif, former Supervisor, Tech Section, IRM, VANJHCS - It is anticipated that Mr. Sharif, among other possible topics, will testify in accordance with the transcribed testimony he gave on July 19, 2005, during the investigation of plaintiff's EEO complaint and the transcribed testimony of his deposition of September 6, 2007. It is anticipated that Mr. Sharif will testify that he did not discriminate against plaintiff or take an action in reprisal; provide legitimate nondiscriminatory reasons for actions at issue in this case; address plaintiff's work and performance and the assignment of work to plaintiff; describe the work, duties and mission of the Tech Section and the essential functions of plaintiff's position, state that plaintiff could not perform the essential functions of his position, and discuss how the accommodation plaintiff sought regarding assignment of work to Circle I only would have been unreasonable and created an undue burden.

16) Scott Snell, Medical Media, IRM, VANJHCS - It is anticipated that Mr. Snell, among other possible topics, will testify in accordance with the transcribed testimony he gave on August 2, 2005. It is anticipated that Mr. Snell will testify that he never witnessed Mr. Sharif yell at employees or make any derogatory comments about one's disability and that plaintiff was never transferred to the Medical Medial department.

17) Terry Stewart, Chief, Human and Learning Resources Service, VANJHCS - It is anticipated that Mr. Stewart, among other possible topics, will testify about the decision to terminate plaintiff's employment with the agency; the letter, dated May 13, 2005, (as well as the May 10, 2005, letter) which he signed, terminating plaintiff's employment with the agency; agency personnel policies and procedures regarding among other things, hiring, misrepresentations on employment applications, probationary employees, termination and reasonable accommodation; the questions

raised and the agency's response regarding plaintiff's on-line degree; the referral of the issue concerning plaintiff's on-line degree to OPM; plaintiff's requests for reasonable accommodation and the agency's responses to same; the agencies offers to plaintiff of other positions; and the determination that plaintiff could not do the essential functions of his position.

18) Steven Stoner, former Assistant Chief Information Resource Management, VANJHCS and former second-line supervisor of plaintiff - It is anticipated that Mr. Stoner, among other possible topics, will testify in accordance with the transcribed testimony he gave on July 19, 2005, during the investigation of plaintiff's EEO complaint and the transcribed testimony of his deposition of September 6, 2007. It is anticipated that Mr. Stoner will testify that he did not discriminated against plaintiff or take an action in reprisal. It is anticipated that Mr. Stoner will discuss his pre-employment interview of plaintiff and the decision to hire plaintiff; describe the position plaintiff held and the work done in the Tech Section and the IRM; discuss the essential functions of plaintiff's position; provide reasons why plaintiff could not perform the essential functions of his position with or without reasonable accommodation; address the agencies handling of plaintiff's requests for reasonable accommodation; state that the accommodation plaintiff requested regarding assignment of work to Circle I was not reasonable and would have created an undue burden on the agency; detail his observations of Mr. Sharif and Ms. Walley; discuss the counseling given to and assistance provided to Mr. Sharif to assist him as a supervisor; refute plaintiff's allegations of retaliation and discrimination; provide legitimate and nondiscriminatory reasons for the agency's actions; address the concerns/questions raised about plaintiff's represented experience and education and state that he contacted the agency's human resources office about such concerns/questions; discuss the determination that plaintiff's college degree was not legitimate and the decision to reduce plaintiff's access to the agency's network; state the reason plaintiff's section was moved to Building 11; address his handling of plaintiff's request for ramp; and discuss why he asked plaintiff to return the store-room keys to him and why he assigned plaintiff work after plaintiff's computer access was reduced.

19) Nicholas Valente, IT Specialist, in Tech Section, IRM, VANJHCS - Mr. Valente was another computer or IT specialist who worked in the same section as plaintiff. It is anticipated that Mr. Valente, among other possible topics, will testify in accordance with the transcribed testimony he gave on July 19, 2005, during the investigation of plaintiff's EEO complaint. It is anticipated that Mr. Valente will testify about his observations of Mr. Sharif as a supervisor and Mr. Sharif's interactions with plaintiff. It is anticipated that Mr. Valente will testify that he and other coworkers moved plaintiff's motorized scooter into and out of Building 11 and that, when plaintiff was given patient area assignments, he and Mr. Mileto did those assignments and gave plaintiff their office area assignments.

20) Rocco Vizzuso, NJVAHCS - It is anticipated that Mr. Vizzuso will testify about inquiries he made and/or information he provided relating to plaintiff's security clearance on or about April 19, 2005 and about the status of plaintiff's security clearance in view of the issues relating to plaintiff's experience and educational background.

21) Juanita Walley, former Supervisor of the Tech Section where plaintiff worked, in the IRM, at VANJHCS - Ms. Walley was plaintiff's initial first-line supervisor. It is anticipated that, among other possible topics, she will testify in accordance with the transcribed testimony she gave on July 19, 2005, during the investigation of plaintiff's EEO complaint. It is anticipated that Ms. Walley will testify that she did not discriminate against plaintiff or take an action in reprisal; address plaintiff's work and performance and the assignment of work to plaintiff; provide legitimate nondiscriminatory reasons for actions at issue in this case; describe the work, duties and mission of the Tech Section and the essential functions of plaintiff's position, and state that plaintiff could not perform the essential functions of his position.

22) David Young, Z-Systems, Mercerville, New Jersey - According to plaintiff, Mr. Young supervised and/or employed plaintiff while plaintiff did work for Z-Systems as a junior programmer during the period 2002 to 2004. It is anticipated that Mr. Young, among other possible topics, will be questioned about his relationship with plaintiff, the technical or computer related work plaintiff did for Z-Systems, plaintiff's qualifications and the representations plaintiff made on documents submitted to the agency regarding the work he did for Z-Systems.

23) Representative from MacArther University - It is anticipated that a representative from MacArther University, among other possible topics, will be questioned about that operations of that university, the credentials of that university, plaintiff's enrollment in that university, plaintiff's attendance/enrollment at that university, plaintiff's grades and course work at that university and plaintiff's transcript from that university submitted to the agency as part of his employment application.

24) Representative from AV Tech - It is anticipated that a representative from AV Tech a technology school/program in which plaintiff was enrolled, among other possible topics, will be questioned about AV Tech's operations, plaintiff's attendance/enrollment at AV Tech and plaintiff's grades and course work at that university.

25) Representative from Metro PA - Plaintiff has represented that the client he did work for when he was employed with Z-Systems was Metro PA, a company located near the racetrack in Pennsylvania. It is anticipated that the representative from Metro PA, among other possible topics, will be questioned about plaintiff, the work plaintiff allegedly did and Z-Systems.

26) Representative from Z-Systems - According to plaintiff, he did work for Z-Systems. A representative from Z-Systems, among other possible topics, will be questioned about plaintiff's relationship with Z-Systems, the technical or computer related work plaintiff did for Z-Systems and the representations plaintiff made on documents submitted to the agency regarding the work he did for Z-Systems.

27) Any and all medical care providers, past and present of plaintiff - It is anticipated that such medical care providers, among other possible topics, will be questioned about plaintiff's medical records, their treatment of plaintiff and their observations of plaintiff.

28) Any and all employees in the Tech Section of the IRM, VANJHCS who were worked in that section when plaintiff was also employed in the section - It is anticipated that these employees, among other possible topics, will be questioned about their observations of the workplace, the supervisors and plaintiff; the essential functions of plaintiff's position; the treatment of plaintiff; and the work environment.

29) Supervisors and Coworkers of plaintiff at all of plaintiff's places of employment subsequent to his employment with the agency - It is anticipated that those supervisors and coworkers, among other possible topics, will be questioned concerning plaintiff's work, performance, disability and qualifications.

30) Defendant reserves the right to call in its case in chief, as to liability, any witnesses listed by plaintiff, including plaintiff himself..

31) If stipulations cannot be reached as to the admissibility of exhibits with plaintiff's counsel, defendant reserves the right to call the applicable records custodians to authenticate the documents listed on defendant's attached exhibit list.

B.     *On damages, defendant intends to call the following witnesses who will testify in accordance with the following summaries:*

1) Defendant reserves the right to call in its case in chief, as to damages, defendant's medical expert witness and any of the liability witnesses listed above. It is anticipated that, if called to testify as to damages, that those witnesses would testify, among other possible topics, as to their observations of plaintiff's physical condition, qualifications and abilities, the matters stated in their summaries above and in defendant's contested facts.

2) Defendant reserves the right to call in its case in chief, as to damages, any of the witnesses listed by plaintiff, including plaintiff himself.

3) Supervisors and Coworkers of plaintiff at all of plaintiff's places of employment prior and subsequent to his employment with the agency - It is anticipated that those supervisors and coworkers will be questioned concerning plaintiff's work, disability, performance, pay, employment records and qualifications.

C.     *Plaintiff objects to the following witnesses for the reasons stated:*

Patricia Connell, M.D. (#2)
Michael Novello (#11)
Sandra Oker (#12)
Scott Snell (#16)
David Young (#22)
Representative from MacArther University (#23)

Representative from AV Tech (#24)
Representative from Metro PA (#25)
Representative from Z-Systems (#26)

Plaintiff objects to these proposed witnesses on the grounds of relevance.  Plaintiff reserves the right to object to anyone identified in #27, #28 and #29 until such individuals are actually identified. *Address at trial*

**8.**     ***Expert Witnesses*** *(No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein.)*

A.        *Plaintiff's expert witnesses are:*

None

B.        *Defendant's objections to the qualification of plaintiff's expert are:*

Not Applicable

C.        *Defendant's expert witnesses are:*

Alan R. Pope, M.D., 108 South Kings Highway, Cherry Hill, New Jersey - Dr. Pope is defendant's medical expert in the field of pulmonary medicine.  It is anticipated that he will testify in accordance with his report, dated July 28, 2008.  It is anticipated that he will testify, among other things stated in his report, that he concludes that, based upon the information available, he is unable to identify that plaintiff has a significant respiratory impairment to a reasonable degree of medical certainty and that it is his professional opinion, to a reasonable degree of medical certainty, that there is no objective evidence of ongoing respiratory disease or an irreversible respiratory impairment based on available data.

D.        *Plaintiff's objections to the qualifications of defendant's experts are:*

None

**9.**     ***Plaintiff's Exhibits*** *(Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial.  Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived.  All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.)*

A.        *Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):*

-33-

See attached.

B.   *Defendant objects to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):*

Ex. P-37 - The reasonable accommodation request, dated June 6, 2006, is not relevant on the issue of liability in that the request was to another agency and subsequent to plaintiff's employment with the VA.

Ex. P-40 - Defendant not aware of this document.  All objections reserved until document is reviewed.

Ex. P-43 - Defendant not aware of this document.  All objections reserved until document is reviewed.

Ex. P-44 - Defendant not aware of this document.  All objections reserved until document is reviewed.

Ex. P-48 - Objection on hearsay and other possible grounds, depending upon portion of document and purpose for use at trial.

Ex. P-49 -  Objection on hearsay and other possible grounds, depending upon portion of document and purpose for use at trial.

Ex. P-50 - Objection on hearsay and other possible grounds, depending upon portion of document and purpose for use at trial.

Ex. P-51 - Objection on hearsay and other possible grounds, depending upon portion of document and purpose for use at trial.

Ex. P-52 - Objection on hearsay and other possible grounds, depending upon portion of document and purpose for use at trial.

**10.    *Defendant's Exhibits* (See instructions above)**

A.   *Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):*

See attached.

B.   *Plaintiff objects to the introduction of defendant's exhibits (set forth number of an exhibit and grounds for objection):*

Ex. D-5
Ex. D-6
Ex. D-8
Ex. D-14
Ex. D-15
Ex. D-16
Ex. D-20
Ex. D-21
Ex. D-22
Ex. D-23
Ex. D-33
Ex. D-50
Ex. D-57
Ex. D-58
Ex. D-67
Ex. D-69
Ex. D-70
Ex. D-88
Ex. D-95
Ex. D-96

Plaintiff objects to these proposed exhibits on the grounds of hearsay and relevance. Plaintiff reserves the right to state other objections to these proposed exhibits at trial.

## 11.   *Plaintiff's Legal Issues*

I.   Plaintiff can prove a claim of disability discrimination.

    A.   Plaintiff can prove a claim of disparate treatment.

        I.   Plaintiff can establish a *prima facie* case of disability discrimination consisting of three elements (1) that he has a disability or that the agency perceived him to have a disability; (2) that he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action.

        ii.   Defendant has not asserted a legitimate, non-discriminatory reason for the actions at issue.

        iii.   Plaintiff can establish that any alleged legitimate, non-discriminatory reason offered by defendant was not the true reason, but rather a pretext for discrimination.

    B.   Plaintiff can prove a claim of failure to reasonably accommodate.

I.     A reasonable accommodation was possible.

ii.     Defendant did not enter into the required interactive process.

iii.     The reasonable accommodation plaintiff requested was not unreasonable.

iv.     Defendant's reliance on the "Direct Threat" theory is improper.

v.     Defendant did not reasonably attempt to accommodate plaintiff.

C.     Plaintiff can prove a claim of disability based hostile work environment.

D.     Plaintiff can prove a claim of reprisal which has three (3) elements, to wit: (1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there is a causal connection between his participation in the protected activity and the adverse employment action.

## 12. *Defendant's Legal Issues*

1. Whether plaintiff exhausted his administrative remedies on all of the claims raised in the instant lawsuit.

2. Whether plaintiff is barred from raising unexhausted claims in this lawsuit.

3. Whether plaintiff exhausted his administrative remedies on any claims besides a) his claims of disability discrimination relating to the allegation that the agency denied him reasonable accommodation, and b) his claims of disability discrimination and reprisal relating to a supervisor's instruction and assignment of work occurring on April 20, 2005, an offer of a lower graded positions on May 4, 2005, and the termination of his employment during his probationary period, effective June 13, 2005.

4. Whether plaintiff can establish a prima facie case of a disparate treatment disability discrimination claim under the Rehabilitation Act - that is, whether plaintiff can establish that a) he is a disabled person; b) he is otherwise qualified to perform the essential functions of the job, and c) he suffered an otherwise adverse employment decision as a result of discrimination - with respect to each of the alleged adverse actions at issue.

5. Whether plaintiff can establish that he is a disabled person within the meaning of the Rehabilitation Act.

6. Whether the physical demands stated in the position description for plaintiff's position and testified to by plaintiff's supervisors amount to "essential functions" of the job.

7.   Whether the essential functions of plaintiff's position included, among other things, a) performing IT work in areas of the Lyons Campus where he would have direct contact with patients, b) physically exerting himself by lifting, moving heavy equipment on a regular basis, as well as walking, talking, standing and bending for significant periods of time, and c) performing IT work in all areas of the Lyons Campus.

8.   Whether plaintiff could perform the essential functions of the job with or without reasonable accommodation.

9.   Whether plaintiff can establish that he is qualified for the position at issue.

10.   Whether the bogus college degree on plaintiff's employment application and resume and/or the issues about the verification of his experience render him unqualified for the position.

11.   Whether plaintiff suffered any adverse employment decision as a result of disability discrimination.

12.   Whether plaintiff, in his effort to establish a prima facie case, can compare himself to other employees who, unlike himself, were not probationary employees.

13.   Whether defendant can articulate some legitimate, non-discriminatory reason for the adverse employment actions at issue in his disability discrimination claim.

14.   Whether plaintiff can prove by a preponderance of the evidence that the reasons proffered by defendant were a mere pretext for discrimination.

15.   Whether plaintiff can establish a claim of failure to accommodate.

16.   Whether plaintiff can establish, by a preponderance of the evidence, as part of his failure to accommodate claim a) that he is a disabled person, b) that he was qualified for the position in question, c) that he was the subject of an adverse employment action, and d) that reasonable accommodation was possible.

17.   Whether defendant can establish, as an affirmative defense to a failure to accommodate claim, that the accommodations requested by plaintiff are unreasonable or would cause an undue hardship on the agency.

18.   Whether the agency was required to eliminate essential functions of plaintiff's position in accommodating him.

19.   Whether the agency was required to create a position for plaintiff.

20.   Whether plaintiff could perform his position without a risk of harm to himself and the

job could not be made safe from that risk of harm without undue hardship on defendant.

21. Whether the agency provided plaintiff with an accommodation of last resort by offering him placement in positions.

22. Whether plaintiff is barred from pursuing his reasonable accommodation claim regarding his request to be assigned work in Circle I because he rejected the agency's offer of placement in other positions.

23. Whether plaintiff's request for reasonable accommodation in the form of a getting a scooter became moot once he obtained the scooter.

24. Whether plaintiff's request for reasonable accommodation in the form of building a ramp was properly lodged with the agency.

25. Whether plaintiff's request for the building of a ramp became moot.

26. Whether plaintiff can establish a disability-based hostile work environment claim by showing that a) he is a qualified individual with a disability under the ADA, b) he was subject to unwelcome harassment, c) the harassment was based on his disability or a request for accommodation, d) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment, and e) that the agency knew or should have known of the harassment and failed to take prompt effective remedial action.

27. Whether plaintiff can establish a claim of retaliation.

28. Whether plaintiff can establish a prima facie case of retaliation by demonstrating that a) he engaged in protected activity, b) the agency took an adverse employment action against him, and c) a causal connection exists between the participation or protected activity and the adverse employment action.

29. Whether plaintiff can establish that the legitimate, non-discriminatory reasons advanced by defendant for the actions at issue in plaintiff's retaliation claim were not the true reasons and that unlawful discrimination was the real reason.

30. Whether plaintiff is entitled to a jury trial on all claims.

31. Whether plaintiff's damages should be barred or limited due to plaintiff's refusal to submit to a complete pulmonary functions study by defendant's medical expert, plaintiff's use of a bogus college degree, his unverified experience, his failure to meet qualifications for the position or any other reason.

32. Whether plaintiff's damages should be offset by his VA disability payments.

**13.**     **Choice of Law** *(If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith.)*

Not applicable.

**14.**     **Miscellaneous** *(Set forth any other matters which require action by, or should be brought to the attention of the Court.)*

Plaintiff's counsel, Alan E. Wolin, will ask to be admitted *pro hac vice*, to the extent required. Mr. Wolin will be trial counsel.

Defendant respectfully requests that all motions in limine be decided in advance of trial, that the parties have at least 14 days after the Court decides motions in limine to submit trial briefs and requests for charge, and that trial briefs and requests for charge be submitted not later than 7 days before trial. Further, defendant requests at least 60 days advance notice of trial date due to complexities, schedules and out of state witnesses..

Defendant

**15.**     **Jury Trials** *- Not later than* 7 calendar days prior to trial:

A.     *Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.*

B.     *Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests of instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations or supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.*

C.     *Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.*

D     PROPOSED VOIR DIRE

**16.**     **Non-Jury Trials** *- Not later than* _____.

A.     *Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.*

-39-

B.    *Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law.  There is reserved to counsel the right to submit additional proposed findings of fact and conclusion of law during the course of the trial on those matters that cannot reasonably be anticipated.*

17.    **Trial Counsel** *(List the names of trial counsel for all parties.)*

Alan E. Wolin, Esq. for Plaintiff
J. Andrew Ruyman, AUSA, for Defendant

18.    **Bifurcation** *(Where appropriate, the issues relating to liability shall be severed and tried to verdict.  Thereafter, all issues related to damages will be tried.)*

The issues of liability and damages ~~shall~~/**shall not** be tried separately.

**19.**   *Estimated Length of Trial*

7 days for Liability

2 days for Damages

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

_____
Attorney for Plaintiff

_____
Attorney for Defendant

Dated: _____

_____
United States Magistrate Judge

## PLAINTIFF'S EXHIBIT LIST FOR TRIAL IN
## DAY V. NICHOLSON, CIVIL ACTION NO. 06-409(JAP)

| Exhibit | Description |
|---------|-------------|
| P-1 | Vacancy Announcement 604-52, 03/18/2004 (Bates 125-127) |
| P-2 | Application for Federal Employment (Bates 11-12) |
| P-3 | Undated letter from plaintiff to Human Resources (Bates 22) |
| P-4 | Plaintiff's Resume for Vacancy Announcement 04-52 (Bates 23) |
| P-5 | Request for Personnel Action dated 6/13/2004 (Bates 2-3) |
| P-6 | Letter from DVA to plaintiff dated 9/8/2003 (Bates 38) |
| P-7 | Thrift Savings Plan Election Form (Bates 29) |
| P-8 | Life Insurance Election Form (Bates 32) |
| P-9 | Position Description, Information Technology Specialist, GS-2210-9 |
| P-10 | VISN3 90-Day Competency Assessment, Computer Specialist, GS-9 (Bates 79-84) |
| P-11 | Printout of work performed by plaintiff (Bates 113-173) |
| P-12 | Letter from Ruth F. Ramirez, N.P., Primary Care, DVA, To Whom It May Concern, dated 10/8/2004 |
| P-13 | Request for Reasonable Accommodation and denial dated 10/27/04 |
| P-14 | Memo from Jenny Liu, M.D. to Human Resources dated 11/5/2004 |
| P-15 | Letter from Beverly Erhardt, Chief, IMS, to plaintiff dated 11/5/2004 |
| P-16 | Memo from Steve Stoner, Assistant Chief, IRM, to plaintiff dated 3/24/2005 |
| P-17 | Letter from Alan E. Wolin to Steve Stoner, Assistant Chief, IRM, dated 4/5/2005 |
| P-18 | Letter from Alan E. Wolin to Toni Hindsman, EEO Manager, dated 4/5/2005 |
| P-19 | Letter from Steve Stoner, Assistant Chief, IRM to Alan E. Wolin dated 4/15/2005 |
| P-20 | Memo from Steve Stoner, Assistant Chief, IRM, to plaintiff dated 4/20/2004 (sic) |
| P-21 | Certificate - AV Tech dated 4/23/2005 |
| P-22 | Memorandum from Kenneth H. Mizrach, Director, to plaintiff dated 4/29/2005 |

| P-23 | Letter from Terry C. Stewart to plaintiff dated 5/10/2005, Subject: Termination During Probationary Period |
|------|---|
| P-24 | Letter from Terry C. Stewart to plaintiff dated May 13, 2005, Subject: Amendment to Termination During Probationary Period dated 5/102006 |
| P-25 | Complaint of Employment Discrimination dated 5/16/2005 |
| P-26 | Notice of Acceptance of Complaint dated 5/19/2005 |
| P-27 | Letter from Kenneth H. Mizrach to plaintiff dated 5/24/2005 |
| P-28 | Reasonable Accommodation Policy, 3/21/2003 |
| P-29 | Memo from Employee Relations Specialist to Toni Hindsman, EEO Manager, dated 7/1/2005 |
| P-30 | MacArther University Transcript (Bates 175) |
| P-31 | Letter from Nancy Hamilton, ER Specialist, to National academic Archive Registrar, dated 4/18/2005 (Bates 180) |
| P-32 | Email from Rocco Vizzuso to Pamela Prewitt dated 4/19/2005 (Bates 174) |
| P-33 | Email from Nancy A. Hamilton to Terry C. Stewart dated 4/29/2005 (Bates 208) |
| P-34 | Email from Terry C. Stewart to Nancy A. Hamilton dated 4/29/2005 (Bates 208) |
| P-35 | Letter with fax to OPM Center for Federal Investigative Services dated 5/2/2005 (Bates 204-208) |
| P-36 | Payroll Records (Bates 53-78) |
| P-37 | Reasonable Accommodation Request dated 6/6/2006 |
| P-38 | Final Agency Decision dated 10/31/2005 |
| P-39 | DVA, Job Announcement Number 7-V94-EO |
| P-40 | Letter from Christian Peralta to plaintiff dated 4/9/2007 re: Vacancy Announcement #07-81 |
| P-41 | Plaintiff's medical records from Department of Veterans Affairs, Lyons Campus |
| P-42 | Email from Toni A. Hindsman to Patricia Connerty (ORM) dated 7/7/2005 |
| P-43 | Bargaining Unit Performance Appraisal and Recognition Election dated 6/19/2006 |
| P-44 | Letter of recommendation by First Sgt. F.R. Miller Perry, USMC (Ret.) |

| P-45 | Plaintiff's 2004 U.S. Individual Income Tax Return |
|------|---------------------------------------------------|
| P-46 | Plaintiff's 2005 U.S. Individual Income Tax Return |
| P-47 | Plaintiff's 2006 U.S. Individual Income Tax Return |
| P-48 | EEO Affidavit of Plaintiff dated 07/14/2005 |
| P-49 | EEO Affidavit of Nicholas Valente dated 07/19/2005 |
| P-50 | EEO Affidavit of Vincent Mileto dated 7/25/2005 |
| P-51 | EEO Counselor's Report |
| P-52 | Deposition transcript of Steve Stoner dated 9/6/2007 |
| P-53 | OPM Salary Rate Tables |

**DEFENDANT'S EXHIBIT LIST FOR TRIAL IN**
**DAY V. NICHOLSON, CIVIL ACTION NO. 06-409(JAP)**

| **Exhibit No.** | **Description** |
|---|---|
| D-1 | Position Description, Information Technology (IT) Specialist GS-2210-9, (Customer Support) PC/NT Support Section, VANJNCS (C2, ROI) |
| D-2 | Organizational Chart for Information Resources Management Service (C1, ROI) |
| D-3 | Plaintiff's Resume (Doc. 23; Day Dep. Ex. 2) |
| D-4 | MP-5, Part I, Chapter 307 - Employment of Veterans (C15, ROI) |
| D-5 | Plaintiff's Official Personnel File (Docs. 1 to 52) |
| D-6 | Plaintiff's Attendance Records (Docs. 53 to 78) |
| D-7 | 90-Day Placement/Competency Assessment of Plaintiff (Docs. 79 to 84) |
| D-8 | Supervisors' Notes/Documents regarding Plaintiff (Docs. 85 to 120) |
| D-9 | Memorandum, dated May 12, 2004, regarding selection of Plaintiff to Information Technologist (Customer Service) GS-2210-9 (T-11), Vacancy Announcement #04-52 (Doc. 121) |
| D-10 | Memorandum, dated May 12, 2004, regarding Announcement #04-52 (Doc. 122) |
| D-11 | Listing of Candidates, Vacancy Announcement #04-52 (Docs. 123 to 124) |
| D-12 | Vacancy Announcement #04-52, Information |

|        |                                                                                                               |
|--------|---------------------------------------------------------------------------------------------------------------|
|        | Technologist (Customer Service), GS-2210-9 (T-11)(Docs. 125 to 127)                                            |
| D-13   | Letter, from Plaintiff, to Human Resources, regarding application to Vacancy Announcement #04-52, with attachments (Docs. 218 to 233) |
| D-14   | Plaintiff's Transcript from MacArther University (Doc. 234)                                                    |
| D-15   | Information regarding distance learning programs, including MacArther University (Docs. 235 to 243)            |
| D-16   | Institute of Technology Certificate, dated April 23, 2005 (Doc. 244)                                           |
| D-17   | Letter, dated August 3, 2004, from Terry Stewart to VA's Office of Security and Law Enforcement (Doc. 245)     |
| D-18   | Personnel Security Action Request and Certification, dated August 4, 2004 (Doc. 247)                           |
| D-19   | Position Sensitivity Level Designation Form, dated August 4, 2004 (Doc. 248)                                   |
| D-20   | OPM Qualification Standards for General Schedule Positions, GS-2210 (Docs. 250 to 252)                         |
| D-21   | OPM Qualification Standards for General Schedule Positions, Administrative and Management Positions (Docs. 253 to 260) |
| D-22   | Information from National Academic Archive Registrar website regarding MacArther University (Docs. 330 to 331) |
| D-23   | Emails, December 9, 2004, from Steve Stoner and website printouts regarding college diploma mills (C13 of ROI) |
| D-24   | List of Vacancies (Docs. 369 to 384)                                                                          |

D-25            Report of Contact, "submitted by" Toni
                Hindsman, signed by Kenneth Mizrach, dated
                May 27, 2005 (Doc. 399 to 400)

D-26            Emails, from May 18, 2005, to May 20, 2005
                (Docs. 391 to 393)

D-27            Report of Contact, dated May 10, 2005 (Doc.
                394)

D-28            Letter, dated May 11, 2005, from Kenneth H. Mizrach, to Plaintiff,
                regarding Administrative Leave Status (Doc. 395)

D-29            Page regarding Physical Demands and Medical Documentation, re
                GS-2210-9 Doc. 397)

D-30            Page re Kyle Day - Medical Documentation
                (Doc. 398)

D-31            Listing of work assigned to plaintiff on
                Lyons Campus, week of June 13, 2004, through
                week of April 25, 2005, and leave used
                during agency employment (Docs. 163 to 173).

D-32            Email from Rocco Vizzuso, dated April 19, 2005, to Pamela Prewitt
                (Doc. 174)

D-33            Guidance Regarding Bogus Educational
                Credentials (Docs. 185 to 202)

D-34            Memorandum, dated May 2, 2005, from Nancy Hamilton, Supv. HR
                Specialist, to OPM Center for Federal Investigative Services (Docs.
                204 to 208)

D-35            Email, dated April 29, 2005, from Terry Stewart, to Nancy Hamilton
                (Doc. 208)

D-36            Request for Determination or Advisory (Doc. 209 to 212)

D-37            SF-50, Excepted Appointment, effective June 13, 2004 (Docs. 213 to
                214)

D-38            Memo/Letter, by Ruth F. Ramirez, NP, dated

October 8, 2004 (Day Dep. Ex. 4)

D-39        Portion of Request for Reasonable Accommodation and Response
            (Day Dep. Ex. 6)

D-40        VANJHCS Reasonable Accommodation Policy, with
            Plaintiff's Request for Reasonable Accommodation (Day Dep. Ex. 7)

D-41        Letter, dated November 5, 2004, from Beverly
            Erhardt to Plaintiff

D-42        Memorandum, dated November 5, 2004, from
            Jenny Liu, M.D., M.S., to Human Resources

D-43        Memorandum, dated March 24, 2005, from Steve
            Stoner, to Plaintiff

D-44        Letter, dated April 5, 2005, from Plaintiff's
            Counsel, to Toni Hindsman, EEO Manager

D-45        Letter, dated April 12, 2005, from Toni
            Hindsman, EEO Manager, to Plaintiff's Counsel

D-46        Letter, dated April 15, 2005, from Steve
            Stoner, to Plaintiff's Counsel

D-47        Memorandum, dated April 20, 2004 (should be 2005), from Steve
            Stoner

D-48        Letter, dated April 21, 2005, from
            VA's Office of Resolution Management, to
            Plaintiff (A1, ROI)

D-49        Memorandum, dated April 29, 2005, from Director (Kenneth H.
            Mizrach) VANJHCS, to Plaintiff (Day Dep. Ex. 8)

D-50        EEO Counselor's Report, dated May 9, 2005
            (A3, ROI)

D-51        Letter, dated May 10, 2005, from Terry C.
            Stewart, to Plaintiff

D-52        Letter, dated May 13, 2005, from Terry C.

Stewart, to Plaintiff

D-53    Complaint of Employment Discrimination, dated
        May 16, 2005, with Letter, dated May 17,
        2005, from Plaintiff's Counsel (A4, ROI)

D-54    Letter, dated May 19, 2005, from Office Resolution Management
        (A6, ROI)

D-55    Letter, dated May 24, 2005, from Kenneth H.
        Mizrach, to Plaintiff

D-56    Letter, dated June 29, 2005, from Office of Resolution Management,
        to Plaintiff's Counsel
        (A9, ROI)

D-57    Final Agency Decision, dated October 31, 2005, from Department of
        Veterans Affairs, Office of Employment Discrimination Complaint
        Adjudication

D-58    Investigative Report, dated August 11, 2005,
        by EEO Investigator Patricia Connerty

D-59    Plaintiff's Responses to Defendant's Interrogatories, with plaintiff's
        Certification, dated March 23, 2007

D-60    Page with Email from Steven Stoner, dated
        July 28, 2005, and Email, dated July 28, 2005, from Toni Hindsman
        (C19, ROI)

D-61    Page with Email, dated February 8, 2005,
        from plaintiff to Nafis Sharif (C19, ROI)

D-62    Page with Email, dated February 23, 2005,
        from Nafis Sharif (C19, ROI)

D-63    Pages with Email, dated March 28, 2005,
        from plaintiff to Steve Stoner, regarding
        ramp

D-64    Page with Email, dated July 25, 2005, from
        plaintiff to Patricia Connerty

-5-

| D-65 | Page with Email, dated July 7, 2005, from Toni Hindsman to Patricia Connerty, EEO Investigator |
|------|------|
| D-66 | Medical Records of plaintiff maintained by the VA |
| D-67 | Medical Records of plaintiff from any other health care provider |
| D-68 | Report, dated July 28, 2008 and CV of Alan R. Pope, M.D. (Defendant's Medical Expert - Pulmonologist) |
| D-69 | Letter, dated February 12, 2008, directed To Whom It May Concern, by Rebecca Connell, M.D. |
| D-70 | Declaration, by Rebecca Connell, M.D., with Exhibit A, dated February 21, 2008 |
| D-71 | Transcript of Testimony by Juanita Walley, from July 19, 2005, and Errata Sheet, dated August 2, 2005  (B5, ROI) |
| D-72 | Transcript of Testimony by Beverly Erhardt, from July 19, 2005, and Errata Sheet, dated August 2, 2005 (B9, ROI) |
| D-73 | Transcript of Testimony by Kenneth Mizrach, from July 21, 2005, and Errata Sheet, dated July 28, 2005 (B12, ROI) |
| D-74 | Transcript of Testimony by Terry Steward, from July 19, 2005, and Errata Sheet, dated July 29, 2005 (B13, ROI) |
| D-75 | Transcript of Testimony by Steven Stoner, from July 19, 2005 (B10, ROI) |
| D-76 | Transcript of Testimony by Nafis Sharif, from July 19, 2005 (B11, ROI) |
| D-77 | Transcript of Testimony by Jeffrey Harley, |

from August 3, 2005 (B8, ROI)

D-78            Transcript of Testimony by Delores Carpenter, from August 3, 2005, and Errata Sheet, dated August 4, 2005 (B7, ROI)

D-79            Transcript of Testimony by Scott Snell, from August 2, 2005 (B6, ROI)

D-80            Transcript of Testimony by Michael Novello, from July 25, 2005 (B4, ROI)

D-81            Transcript of Testimony by Nicholas Valente, from July 19, 2005 (B3, ROI)

D-82            Transcript of Testimony by Vincent Mileto, from July 25, 2005 (B2, ROI)

D-83            Page with Email, dated August 2, 2005, from Kathleen DeVierno, and Email, dated July 25, 2005, from Patricia Connerty (B14, ROI)

D-84            Transcript of Testimony by Plaintiff, from July 14, 2005, and Errata Sheet, dated July 27, 2005

D-85            Transcript of Deposition of Plaintiff, from July 31, 2007, and December 19, 2007, and any deposition exhibits

D-86            Transcript of Deposition of Nafis Sharif, from September 6, 2007, and any deposition exhibits

D-87            Transcript of Deposition of Steve Stoner, from September 6, 2007, and any deposition exhibits

D-88            Employment records from plaintiff's subsequent employers

D-89            Plaintiff's 2004 Tax Return, Form 1040A, with all attachments

D-90            Plaintiff's 2005 Tax Return, Form 1040, with all attachments

| | |
|---|---|
| D-91 | Plaintiff's 2006 Tax Return, Form 1040, with all attachments |
| D-92 | Plaintiff's 2007 Tax Return, with all attachments |
| D-93 | Plaintiff's 2008 Tax Return, with all attachments |
| D-94 | Plaintiff's Outline of Disability and Retaliation Events (C19, ROI) |
| D-95 | Plaintiff's military records |
| D-96 | Plaintiff's employment records from Z-Systems, a prior employer |
| D-97 | Applicable regulations and policies regarding the employment and termination of agency probationary employees |

Respectfully submitted,

RALPH J. MARRA, JR.
Acting United States Attorney

By: J. ANDREW RUYMANN
Assistant U.S. Attorney

Dated: May 22, 2009